**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TARRANCE THOMPSON, | ) | |
| | ) | |
| Petitioner, | ) | Case No. 18-cv-4387 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| KIM LARSON, Warden, | ) | |
| Danville Correctional Center, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

**MEMORANDUM OPINION AND ORDER**

Petitioner Tarrance Thompson received a 25-year sentence for armed robbery after

stealing $260. His appeal on direct review was unsuccessful, and so was his state collateral

challenge. In 2018, Thompson filed a petition for a writ of habeas corpus. Two and a half years

later, he requested leave to file an amended petition that advances new claims and new theories

based on new evidence. He seeks discovery, too.

Petitioner Thompson's Motion for Leave to File an Amended Petition for Writ of Habeas

Corpus and for Discovery is hereby denied.

**Background**

This case involves an armed robbery in Chicago. In a nutshell, the state charged

Petitioner with robbing a drug dealer on May 1, 2012. *See* 2/26/13 Trial Tr., at SA0004, L-

17:18-23 (Dckt. No. 66-1, at 83 of 398) ("What the State says is true. Willie Hughes, their

alleged victim, is a drug dealer. He sells drugs on West Grenshaw where the officers had their

surveillance set up.") (opening statement of defense counsel). The state alleged that Petitioner

took drug proceeds from the victim (Willie Hughes) by the use of force, or by threatening the

imminent use of force, while he carried or was armed with a firearm.  *See* 6/26/15 Order, *People of the State of Illinois v. Thompson*, at ¶¶ 4, 14 (Dckt. No. 10-1).

At trial, two Chicago police officers took the stand.  One officer testified that he saw Petitioner exit a vehicle, walk down the block, and enter a vacant building.  *Id.* at ¶ 5.  About 30 seconds later, there was a flurry of activity.  Individuals scattered from the area.  *Id.*  The officer saw Petitioner exit the building with a chrome handgun in his right hand.  *Id.*; *see also* 2/26/13 Trial Tr., at SA0008, L-30:14–15 (Dckt. No. 66-1, at 87 of 398) ("I could see in his right hand a large chrome shinny [sic] handgun.") (testimony of Officer Diblich).  The officer watched Petitioner get in a car and drive off.  *See* 6/26/15 Order, *People of the State of Illinois v. Thompson*, at ¶ 5 (Dckt. No. 10-1).  The officer radioed for help.  *Id.*

A second officer testified that he received the call about the gun, so he stopped Petitioner's vehicle and approached the car.  *Id.* at ¶ 6.  He then spotted a chrome-handled handgun on Petitioner's lap.  *Id.*  The two officers placed Petitioner under arrest and recovered a loaded revolver.  *Id.*

According to the officers, Willie Hughes (again, the victim) then arrived on the scene.  *Id.* at ¶ 7.  He accused Petitioner of robbing him at gunpoint, taking $260.  *Id.*  An officer searched Petitioner and, sure enough, found $260 in his right front pants pocket.  *Id.*

But Hughes (an admitted heroin dealer) told a different story at trial.  He testified that Petitioner had no gun, and that he voluntarily gave Petitioner a brown paper bag.  *Id.* at ¶¶ 9–10.  And Petitioner, according to Hughes, didn't rob him at all.  Instead, the two of them cooked up a plan to fake a theft of $27,000 in drug money owned by the gang, and then split the proceeds.  *Id.* at ¶ 9.  So it was all an inside job.  He denied ever telling the police that he had been robbed.  *Id.* at ¶ 10.

After Hughes changed his story, an Assistant State's Attorney took the stand and testified about what Hughes had said at the time of the arrest. *Id.* at ¶ 8. The prosecutor testified that Hughes gave a voluntary, signed statement after the incident and accused Petitioner of robbing him at gunpoint. *Id.* at ¶ 8; *see also* 5/2/12 Statement of Willie C. Hughes, at 2 (Dckt. No. 66-1, at 372 of 398) ("Willie Hughes states that 'Capone' said to him 'give it here.' Willie Hughes states that while Capone was still holding the gun, he took $260.00 that he was holding from his left hand."). So the prosecution established a prior inconsistent statement – the trial testimony by Hughes was inconsistent with what he had told authorities right after the incident.

Petitioner took the stand in his own defense. *See* 6/26/15 Order, *People of the State of Illinois v. Thompson*, at ¶ 12 (Dckt. No. 10-1). He testified that he received a phone call from Hughes about fake-stealing drug proceeds. *Id.* The two of them cooked up a plan. They agreed that Petitioner would arrive at the drug-dealing location, take drug money, meet Hughes a short distance away, and then return the money (after keeping his share). *Id.*

The jury didn't buy it. The jury found Petitioner guilty of armed robbery and of being an armed habitual criminal. *Id.* at ¶ 14. The court ultimately sentenced him to 25 years for armed robbery, and 20 years for the armed habitual criminal offense, to be served concurrently. *Id.*

He appealed. The Appellate Court of Illinois affirmed his conviction and sentences. *See* 6/26/15 Order, *People of the State of Illinois v. Thompson*, 2015 IL App (1st) 131366-U, *as modified on denial of reh'g* (August 21, 2015) (Dckt. No. 10-1). The Supreme Court of Illinois denied a petition for leave to appeal. *See* 11/25/15 Order, *People of the State of Illinois v. Thompson*, 42 N.E.3d 374 (table) (Ill. 2015) (Dckt. No. 10-7).

Petitioner then pursued state collateral review by filing a pro se petition under the Post-Conviction Hearing Act on April 12, 2016. *See* 6/10/16 Order, *People of the State of Illinois v.*

3

*Thompson* (Dckt. No. 10-9, at 33 of 41). One of the claims involved ineffective assistance of counsel. Thompson faulted his attorney for failing to interview witnesses at the scene, including three people – "Tall," "Lord," and "Boise" – who provided security for the drug sales. *Id.* at 8 (Dckt. No. 10-9, at 35 of 41) ("Petitioner asserts that counsel did not attempt to identify any of the individuals present at the scene, who he identifies as Tall, Lord, and Boise."). Thompson offered an affidavit from Thomas Woods, who he claimed was "Lord." *See* Woods Affidavit, Am. Pet., Ex. F, at SA0224 (Dckt. No. 66-1, at 303 of 398) ("I go by the nickname of Lord.") (he was apparently in the Vice Lords). According to the affidavit, Woods saw Thompson carrying a brown paper bag, but he saw no gun or aggressive behavior. *Id.* at ¶¶ 5–6, 8–9.

The trial court dismissed his post-conviction petition. *See* 6/10/16 Order, *People of the State of Illinois v. Thompson*, at 1 (Dckt. No. 10-9, at 33 of 41). The trial court expressly found the issue about the Woods affidavit to be "meritless." *Id.* at 8 (Dckt. No. 10-9, at 35 of 41). At the time of trial, Thompson knew the nicknames of the potential witnesses, but not their real names. So counsel couldn't be faulted for failing to interview witnesses because he didn't know who they were. *Id.* at 9 ("Petitioner's claim is predicated on a causality dilemma – he could not identify the witnesses without photographs, while counsel could not obtain their photographs without first knowing their identities.").

The trial court also concluded that the Woods testimony would not have changed the outcome of the trial in light of the "credible and consistent" testimony of two officers. *Id.* "The officers observed petitioner with a gun at the scene and in the vehicle he departed the scene in, respectively. Furthermore, Officer Rojas recovered the gun from in between the seat and door that was adjacent to petitioner, after petitioner's vehicle was stopped." *Id.*

4

The Appellate Court of Illinois affirmed. *See* 12/15/17 Order, *People of the State of Illinois v. Thompson*, 2017 WL IL App. (1st) 161998-U (Dec. 15, 2017) (Dckt. No. 10-8). The Appellate Court concluded that the Woods testimony would not have made a difference because it was cumulative of the testimony of Thompson and Hughes. *Id.* at ¶ 19 ("Woods's testimony, if presented at trial, would have been cumulative to that of Hughes and defendant, who each testified that defendant did not possess a gun and did not rob Hughes."). That "version of events was rejected by the jury, who heard the testimony of the two Chicago police officers, each of whom saw defendant with a gun." *Id.* at ¶ 20.

For the second time, the Supreme Court of Illinois denied a petition for leave to appeal. *See* 3/21/18 Order, *People of the State of Illinois v. Thompson*, 95 N.E.3d 509 (table) (Ill. 2018) (Dckt. No. 10-12).

Thompson filed a habeas petition in federal court on June 25, 2018. *See* Pet. (Dckt. No. 1). The petition raised three grounds for relief: (1) the trial court gave an unwarranted accomplice instruction; (2) his attorney was ineffective because he failed to investigate witnesses at the scene; and (3) the trial court weighed the evidence and made factual findings in violation of the Illinois Post-Conviction Hearing Act. *Id.* at 17, 32, 36.

Judge Aspen, this Court's predecessor before reassignment, ruled that the first claim was procedurally defaulted because Thompson did not raise it in state court. *See* 5/31/19 Order, at 7–9 (Dckt. No. 16). Judge Aspen also ruled that the third claim was not cognizable on federal habeas review because it involved an alleged violation of state law. *Id.* at 18–20.

But Judge Aspen parted ways with the state appellate court about the potential impact of the Woods affidavit. "We do not share the appellate court's confidence that Woods' testimony, if properly investigated and elicited at trial, would have made so little difference." *Id.* at 11.

"What transpired between Hughes and Petitioner, and whether Petitioner possessed a gun in their interaction, are the essential questions behind Petitioner's conviction." *Id.* at 12. So Judge Aspen ruled that corroborating evidence from Woods "'cannot reasonably be described as cumulative.'" *Id.* at 13 (quoting *Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012)).

Judge Aspen ordered an evidentiary hearing on the ineffective assistance of counsel claim, referred the hearing to Magistrate Judge Weisman, and appointed counsel to represent Petitioner at the hearing. *Id.* at 20–21. After reassignment of the case from Judge Aspen, this Court clarified the scope of that evidentiary hearing. *See* 6/3/20 Order (Dckt. No. 58).

On October 22, 2020 – almost 17 months after Judge Aspen ordered an evidentiary hearing and appointed counsel – Thompson filed a motion for leave to amend the petition. The amended petition includes six claims, addressing: (1) actual innocence; (2) ineffective assistance of counsel; (3) providing the jury with a witness statement that was not in evidence; (4) the accomplice jury instruction; (5) prosecutorial misconduct during closing argument; and (6) cumulative failures. *See generally* Am. Pet. (Dckt. No. 66-1).

Five of the six claims are new, including the actual innocence claim. *See* Mtn., at 2 (Dckt. No. 66) ("The Amended Petition . . . brings five new claims . . . ."). The sixth claim, ineffective assistance of counsel, did appear in the original petition. But the amended petition seeks to expand the basis for the claim in three ways. He seeks to add allegations that his counsel failed to (1) perform a forensic analysis of the gun (Am. Pet. ¶¶ 64–65); (2) gather phone records (*id.* at ¶¶ 66–68); and (3) cross examine the police officers at trial with an arrest report for Anthony Williams, the passenger in the car (*id.* at ¶¶ 87–90, 96–100). Those theories are in addition to the theory in the original petition (which remains part of the amended petition) that his counsel failed to investigate exculpatory eyewitnesses (*id.* at ¶¶ 79–86).

6

The only issues before the Court at this juncture are whether to grant Petitioner leave to amend his habeas petition, and whether to allow discovery.

## Analysis

A federal court may grant habeas relief only if the petitioner demonstrates that he is in custody "in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a). To "curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law," Congress revised several statutes governing federal habeas relief as part of the Anti-Terrorism and Effective Death Penalty Act. *See Williams v. Taylor*, 529 U.S. 362, 404 (2000).

"Congress enacted AEDPA to advance the finality of criminal convictions." *See Mayle v. Felix*, 545 U.S. 644, 662 (2005). "To that end, it adopted a tight time line, a one-year limitation period ordinarily running from 'the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review.'" *Id.* at 662 (quoting 28 U.S.C. § 2244(d)(1)(A)); *Duncan v. Walker*, 533 U.S. 167, 179 (2001) (noting that the one-year limitation period of the AEDPA "quite plainly serves the well-recognized interest in the finality of state court judgments" and "reduces the potential for delay on the road to finality by restricting the time that a prospective federal habeas petitioner has in which to seek federal habeas review").

Here, Petitioner seeks to raise new claims long after the expiration of the one-year limitation period. He seeks to bypass the statute of limitations by passing through the actual innocence gateway. On the record at hand, the actual innocence gateway is closed, and there is no way around it.

## I.     Amending the Petition

Rule 15(a)(2) provides that district courts should "freely give leave" to amend a complaint "when justice so requires."  *See* Fed. R. Civ. P. 15(a)(2).  That rule equally applies to habeas petitions.  *See Mayle*, 545 U.S. at 655; Fed. R. Civ. P. 81(a)(4); Rule 12 of the Rules Governing Section 2254 Cases in the United States District Courts ("The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules.").

The decision to grant or deny a motion to amend a habeas petition "is a matter purely within the sound discretion of the district court."  *Aldridge v. Forest River, Inc.* 635 F.3d 870, 875 (7th Cir. 2011).  The text of the rule reflects a "liberal policy of amendment."  *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chicago & Nw. Indiana*, 786 F.3d 510, 521 (7th Cir. 2015).

But the Federal Rules do not require an anything-goes approach, either.  "[D]istrict courts have broad discretion to deny leave to amend where there is undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies, undue prejudice to defendants, or where the amendment would be futile."  *Arreola v. Godinez*, 546 F.3d 788, 796 (7th Cir. 2008).  "Delay on its own is usually not reason enough for a court to deny a motion to amend."  *See Soltys v. Costello*, 520 F.3d 737, 743 (7th Cir. 2008).  But "the longer the delay, the greater the presumption against granting leave to amend."  *See King v. Cooke*, 26 F.3d 720, 723 (7th Cir. 1994) (citation omitted).

In the case at hand, justice does not require granting Petitioner leave to amend.  An amended petition would be futile.  *See Heng v. Heavner, Beyers & Mihlar, LLC*, 849 F.3d 348, 354 (7th Cir. 2017) ("District courts have broad discretion to deny leave to amend where . . . the

amendment would be futile."). Petitioner waited years to bring his new claims, and they are now time barred. Justice does not require an amendment because the claims aren't viable anyway.

Petitioner tries to bring his untimely claims to the courthouse by walking through the actual innocence gateway. *See generally Schlup v. Delo*, 513 U.S. 298, 324 (1995). But even if the jury had heard the new evidence, it is unlikely that a reasonable jury would have acquitted him. As a result, Petitioner cannot pass through the actual innocence gateway, so his new claims remain time barred.

### A.      The Untimely Claims

Petitioner waited too long to advance his new claims. The proposed amendment comes late in the day, over two years after Petitioner filed the original petition, and over one year after Judge Aspen's Memorandum Opinion and Order. Amending the complaint would be futile because the new claims would be time barred. Amending a complaint to add time-barred claims would not advance the ball.

The Antiterrorism and Effective Death Penalty Act of 1996 provides that a "1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court," which usually runs from the "date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Time spent on state post-conviction proceedings or other collateral review doesn't count. *See* 28 U.S.C. § 2244(d)(2) (requiring tolling for state collateral review).

Petitioner is attempting to raise new claims long after the expiration of the one-year period. His judgment became final on February 23, 2016 (*i.e.,* 90 days after the Illinois Supreme Court denied leave to appeal on direct review, when the period for bringing a petition for a writ

of certiorari before the U.S. Supreme Court expired). *See* 11/25/15 Order, *People of the State of Illinois v. Thompson* (Dckt. No. 10-7); *see also* 28 U.S.C. § 2244(d)(1)(A); *Gonzalez v. Thaler*, 565 U.S. 134, 150 (2012). Then, 49 days passed before he sought state collateral review on April 12, 2016, which temporarily stopped the clock. *See* 6/10/16 Order, *People of the State of Illinois v. Thompson* (Dckt. No. 10-9, at 33 of 41). But the clock started ticking again when state collateral review ended on March 21, 2018. *See* 3/21/18 Order, *People of the State of Illinois v. Thompson* (Dckt. No. 10-12); *see also Lawrence v. Florida*, 549 U.S. 327, 337 (2007).

He filed a timely habeas petition in federal court on June 25, 2018. *See* Pet. (Dckt. No. 1). There is no dispute that the original petition was timely. But the clock continued to run on any new claims, and the clock ran out when the one-year period ended on January 31, 2019 (that is, 49 days plus 316 days later equals one year, which fell on January 31, 2019).

Petitioner filed the amended petition on October 22, 2020, meaning 630 days after the deadline of January 31, 2019. So the new claims from October 2020 are untimely (again, except actual innocence) unless they relate back to the original (timely) petition filed in June 2018.

The filing of a federal habeas petition does not stop the clock for future claims unless the new claims relate back to a timely petition. *See Mayle*, 545 U.S. at 655. To relate back, a "common core of operative facts" must "unit[e] the original and newly asserted claims." *Id.* at 659, 664. The new claim and the old claim must be similar in "time and type." *Id.* at 650, 657; *see also* Fed. R. Civ. P. 15(c)(1)(B) ("An amendment to a pleading relates back to the date of the original pleading when . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out – or attempted to be set out – in the original pleading."). It is not enough if the new claim "stems from the habeas petitioner's trial,

conviction, or sentence," because that approach would "obliterate[] the statute of limitations." *Mayle*, 545 U.S. at 656, 659.

The new claims in the amended petition do not relate back to the old claims in the original petition. Most of the claims in the amended petition are entirely new, with no foothold in the original petition. The untimely claims do not share a common core of facts with the timely claims.

The amended petition includes claims about providing the jury with a witness statement that was not in evidence (claim 3), prosecutorial misconduct (claim 5), and the cumulative failures (claim 6). They did not appear in the original petition, and they did not arise out of the same conduct, transaction, or occurrence. They advance new arguments based on new facts, so they appeared too late in the day. Adding them now would simply tee them up for dismissal later on statute-of-limitations grounds.

The claim about the jury instruction (claim 4) did have a foothold in the original habeas petition. *See* Pet. at A-2 (Dckt. No. 1, at 17 of 91). But once again, that claim is about a failure to comply with state law. For that reason, as Judge Aspen previously ruled, it is not grounds for a federal habeas petition. *See* 5/31/19 Order, at 7–9 (Dckt. No. 16). So even if relation back applies, it would be futile to add a claim that is defective on the merits.

At first blush, the best candidate for relation back is the ineffective assistance of counsel claim (claim 2). Petitioner raised ineffective assistance of counsel in his original, timely petition. *See* Pet., at A-17 (Dckt. No. 1, at 32 of 91).

But the theory was completely different. Petitioner alleged in his original petition that his lawyer did not interview witnesses at the scene. *Id.* at A-17 to A-21 (Dckt. No. 1, at 32–36 of 91). In the amended petition, Petitioner alleges that his lawyer should have performed forensic

11

tests on the gun, presented phone records, and used an arrest record to impeach police officers on the stand. *See* Am. Pet., at ¶¶ 76–102. None of those theories has anything to do with interviewing witnesses at the scene of the crime.

The theories of ineffectiveness are entirely new, so the new untimely claims cannot fit inside the old timely petition. *See Jackson v. United States*, 2020 WL 4261742, at *2 (S.D. Ind. 2020) ("Mr. Jackson's new claim does not relate back to any of the claims asserted in Mr. Jackson's original § 2255 motion. Although he presented several arguments of ineffective assistance of counsel, raising ineffective assistance of counsel in both the original § 2255 and amended § 2255 motion, standing alone, is not sufficient to show relation back."); *United States v. Griffin*, 2010 WL 1780337, at *4 (N.D. Ill. 2010) (holding that a new, untimely claim of ineffective assistance of counsel did not relate back to the original claim); *United States v. Gonzalez*, 592 F.3d 675, 680 (5th Cir. 2009) ("New claims of ineffective assistance of counsel do not automatically relate back to prior ineffective assistance claims simply because they violate the same constitutional provision."); *United States v. Ciampi*, 419 F.3d 20, 24 (1st Cir. 2005) (same).

In sum, the claims are barred by the one-year limitations period. Unless there is a way around it (through the gateway of actual innocence), the claims are untimely, so an amendment would be futile. There is no point in amending a complaint to add time-barred claims.

### B. The Actual Innocence Gateway

Petitioner is attempting to raise time-barred claims, but that is not the end of the matter. A showing of actual innocence can provide a path around the bar. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013) ("[A]ctual innocence, if proved, serves as a gateway through which a

petitioner may pass whether the impediment is a procedural bar . . . or . . . expiration of the statute of limitations.").

An inmate can overcome the statute of limitations by "showing that the federal court's failure to address his claim on the merits would work a fundamental miscarriage of justice." *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016); *see also House v. Bell*, 547 U.S. 518, 536 (2006); *McQuiggin*, 569 U.S. at 386 (extending the actual innocence framework for procedural defaults to a failure to comply with the statute of limitations) ("We hold that actual innocence, if proved, serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations.").

The miscarriage-of-justice exception "requires the petitioner to make a convincing showing of actual innocence." *Jones*, 842 F.3d at 461; *see also McQuiggin*, 569 U.S. at 394–99 (explaining the "miscarriage of justice exception to AEDPA's statute of limitations"). "To pass through the actual-innocence gateway," the petitioner "must have 'new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial.'" *Jones*, 842 F.3d at 461 (quoting *Schlup*, 513 U.S. at 324).

To prevail on an actual innocence claim, a petitioner has the burden to "show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *See Schlup*, 513 U.S. at 327. That is, a petitioner "does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 329.

13

"The actual innocence gateway of *Schlup* demands more than a possible inference that might lead a juror to acquit." *Gladney v. Pollard*, 799 F.3d 889, 899 (7th Cir. 2015). To meet this "heavy burden," a petitioner "must show it is likely that *no* reasonable juror would have convicted." *Id.* (emphasis in original).

A gateway actual innocence claim requires new evidence, meaning evidence that was not presented at trial. *Id.* at 896. But it does not have to be newly *discovered* evidence. Any new evidence will do. *See id.* at 898; *see also Gomez v. Jaimet*, 350 F.3d 673, 679 (7th Cir. 2003) ("All *Schlup* requires is that the new evidence is reliable and that it was not presented at trial.").

This Court must "consider all the evidence, old and new, and based on this total record, make a 'probabilistic determination about what reasonable, properly instructed jurors would do.'" *Coleman v. Hardy*, 628 F.3d 314, 319 (7th Cir. 2010) (quoting *House*, 547 U.S. at 538). "It is not the court's role to determine independently what the petitioner likely did or did not do; rather, its task is to assess the likely impact of the new evidence on reasonable jurors." *Arnold v. Dittmann*, 901 F.3d 830, 837 (7th Cir. 2018); *see also Hayes v. Battaglia*, 403 F.3d 935, 940 (7th Cir. 2005) (Flaum, J., concurring) ("Unlike a review of the sufficiency of the evidence which focuses on whether a rational juror *could* have convicted, a habeas court considering actual innocence . . . determin[es] whether rational jurors *would* have convicted.") (emphasis in original). The question is "how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 538.

The standard is high, and the climb is steep. A "substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare," and "claims of actual innocence are rarely successful." *Schlup*, 513 U.S. at 324; *see also id.* at 321–22 (confirming that the fundamental miscarriage of justice exception applies only in an "extraordinary case");

14

*House*, 547 U.S. at 538 (emphasizing that the *Schlup* standard is "demanding" and permits review only in an "extraordinary" case); *McQuiggin*, 569 U.S. at 386 (reiterating that "tenable actual-innocence gateway pleas are rare," and that the standard is "demanding" and "seldom met"); *Gladney*, 799 F.3d at 896 ("The actual innocence gateway is narrow."). The selection of adjectives and adverbs – "extremely rare," "rarely successful," "demanding," "extraordinary," "narrow," and so on – underscores the difficulty of crossing the actual innocence threshold.

But the burden for a gateway actual innocence claim is not as heavy as the standard for a substantive claim of actual innocence. "In a substantive actual-innocence claim, the petitioner's new evidence must be strong enough to convince the court that his sentence is constitutionally intolerable '*even if* his conviction was the product of a fair trial.'" *Jones v. Calloway*, 842 F.3d 454, 462 (7th Cir. 2016) (quoting *Schlup*, 513 U.S. at 316) (emphasis in original). But in a procedural (or "gateway") actual innocence claim, the new evidence "need only establish sufficient doubt about his guilt to justify a conclusion that his sentence is a miscarriage of justice '*unless* his conviction was the product of a fair trial.'" *Id.* (quoting *Schlup*, 513 U.S. at 316) (emphasis in original).

Petitioner advances a gateway actual innocence claim (not a stand-alone actual innocence claim) in claim 1 of the amended petition. *See* Am. Pet., at ¶ 57 (Dckt. No. 66-1, at 33 of 398) (alleging that "procedural bars" do not stand in the way because it would be a "fundamental miscarriage of justice for Mr. Thompson to remain incarcerated" because he "is actually innocent of the offenses"). He brings an actual innocence claim to "open the gate" for the procedurally barred claims. *Id.*

15

The gate is closed. Even assuming the truth of the well-pleaded allegations, Petitioner has not stated an actual innocence claim within the meaning of *Schlup*. The new evidence would not lead a reasonable jury to an acquittal.

Petitioner rests his actual innocence claim on four pieces of evidence that were not presented at trial. Specifically, Petitioner rests on: (1) forensic evidence from the gun; (2) phone records; (3) an arrest report for Anthony Williams, the person who drove Petitioner to the scene; and (4) the testimony of Thomas Woods, an eyewitness. Two of the four pieces of evidence – the forensic tests of the gun, and the phone records – do not yet exist.

Stacking these four pieces of evidence on top of the evidence presented at trial would not make reasonable jurors more likely than not to switch their verdict from guilty to not guilty. *See generally Gomez*, 350 F.3d at 680–81 (evaluating the record and explaining why the "new evidence does not prove Gomez's theory of innocence"). A reasonable jury likely would have found Petitioner guilty anyway. The scales do not budge.

The first piece of evidence is a forensic analysis of the gun. *See* Am. Pet. ¶ 58 (Dckt. No. 66-1). No forensic analysis ever took place. Instead, Petitioner believes that an analysis would show that his fingerprints aren't on the gun. *Id.*

The absence of a fingerprint in 2021 does not necessarily mean that Petitioner did not possess the gun in 2012. Perhaps he possessed the gun without leaving a detectable fingerprint. A person can walk without making footprints, and can hold something without leaving fingerprints. It depends on the object – not all surfaces are amenable to detectable fingerprints. A person does not necessarily leave fingerprints on everything that they hold. Or perhaps there was a fingerprint at the time of trial, but is no longer there today. The lack of a fingerprint does not mean that he never held the gun. A fingerprint is not a *sine qua non* of possession.

16

Suppose a forensic analysis of the gun takes place. And imagine that the analysis finds no fingerprint on the weapon. The lack of a print would not advance the ball across the acquittal goal line. The absence of a fingerprint might support a possible inference that Petitioner did not possess the gun. But it would not compel the necessary inference that Petitioner did not possess the gun. *See Gladney*, 799 F.3d at 899 ("That is a possible inference but by no means a required one. The actual innocence gateway of *Schlup* demands more than a possible inference that might lead a juror to acquit.").

Thompson also overlooks the fact that two police officers testified that they saw Petitioner with a gun. *See* 6/26/15 Order, *People of the State of Illinois v. Thompson*, at ¶¶ 5–6 (Dckt. No. 10-1). A reasonable jury could believe that testimony, even if a forensic analysis revealed no fingerprints. *See United States v. Thomas*, 597 F. App'x. 882, 885 (7th Cir. 2015) (affirming a conviction for drug trafficking despite the lack of forensic evidence) ("[T]he government never relied on forensic evidence to tie Thomas to the scenes of the crimes or to the drugs. The fingerprint expert acknowledged that identifiable prints had not been found on the plastic bags. . . . [T]he absence of Thomas's DNA on the bags would not definitively show that he never touched them . . . .").

Even if the forensic analysis took place and revealed no fingerprints, it is unlikely that a reasonable jury would have changed its verdict. The testimony from two police officers was more than enough to support the verdict. *See Hayes*, 403 F.3d at 938 ("[I]t is black letter law that testimony of a single eyewitness suffices for conviction even if 20 bishops testify that the eyewitness is a liar."). There is no reason to think that a reasonable jury would have changed its mind and acquitted Petitioner based on the absence of fingerprints.

17

The second piece of new evidence is phone records. *See* Am. Pet. ¶ 58 (Dckt. No. 66-1). Petitioner did not present those records at trial. But he believes that they would show that he spoke with the alleged victim (Willie Hughes) on the day of the alleged crime.

The phone records are borderline-new evidence, at best. Both Petitioner and Hughes testified that they spoke on the phone that day. *See* Trial Tr., Am. Pet., at SA0063–64 (Dckt. No. 66-1, at 142–43 of 398); *id.* at SA0143–144 (Dckt. No. 66-1, at 222–23 of 398). The state did not contest it. So the evidence is new only in the sense that the phone records would back up part of their testimony. It would corroborate a story that the jury already heard.

It is unlikely that the phone records would have changed the minds of any of the jurors. Suppose the phone records showed a phone call. That is neither here nor there. Robberies don't always involve strangers. People sometimes rob people they know. Petitioner could have spoken with Hughes on the telephone, and then robbed him later that day. A conversation is not inconsistent with a robbery.

Plus, the call could have facilitated the robbery somehow. Perhaps the victim told Petitioner where he was, or revealed that he was loaded with cash. A phone call between a criminal defendant and a victim is not particularly exculpatory. If anything, it is the type of evidence that prosecutors often present.

The existence of a phone call is especially un-illuminating in this particular case. All parties – the state, and the Petitioner – acknowledge that Petitioner and Hughes (the victim) knew each other. The state presented evidence that Petitioner met with Hughes, and then robbed him. The Petitioner presented evidence that he met with Hughes and planned a fake robbery. A phone call does not tilt the scales in favor of either side very far. And it certainly does not add so much heft to the scales that the verdict would have been one-sided.

18

The third piece of evidence is an arrest report for Anthony Williams, who drove Petitioner to the location of the victim (again, Willie Hughes). Petitioner claims that the arrest report "indicates that Mr. Williams, and not Mr. Thompson, possessed the gun." *See* Mtn., at ¶ 11 (Dckt. No. 66). But the two facts – possession by Petitioner, and possession by Williams – are not mutually exclusive. Petitioner could have possessed a gun that was later recovered from Williams. At best, the arrest report would create grounds for impeachment of one of the testifying officers. Even so, it was unlikely to change any minds.

More importantly, Petitioner overstates the content of the Williams arrest report. The Amended Petition repeatedly claims that the Williams arrest report states that Williams – and *not* Petitioner – possessed the gun. *See, e.g.,* Am. Pet., at ¶ 9 (referring to "police reports indicating that the gun the arresting officers allegedly recovered from Mr. Thompson was recovered from Mr. Williams that night"); *id.* at ¶ 35 ("Mr. Williams' arrest report states that he was armed with a handgun."); *id.* at ¶ 41 ("Mr. Williams' arrest report indicated that the gun had been recovered from Mr. Williams."); *id.* at ¶ 42 ("Trial counsel did not confront Officer Diblich with Mr. Williams' police report, which Officer Diblich had authored and attested to, and which identified Mr. Williams as the man who possessed the gun."); *id.* at ¶ 58 ("That report indicates that the gun was recovered from Mr. Williams.").

The Williams arrest report says no such thing. It does not say that Williams possessed the gun, and Petitioner did not. It simply says that the police recovered a weapon in connection with the arrest of Williams. The recovery of a weapon during an arrest of Williams is not inconsistent with possession by Petitioner, especially when they were arrested in the same car at the same time.

19

The Williams arrest report does not foreclose the finding that Petitioner possessed the weapon. It is true that the arrest report for Williams stated: "Weapon recovered." *See* Williams Arrest Report, Am. Pet., Ex. H, at SA0235 (Dckt. No. 66-1, at 314 of 398). But so does the arrest report for Thompson, the Petitioner: "Weapon recovered . . . . Weapon recovered was a Smith and Wesson, .357 Magnum[.]" *See* Thompson Arrest Report, Am. Pet., Ex. G, at SA0229 (Dckt. No. 66-1, at 308 of 398).

Those descriptions are consistent with the first page of each arrest report. The report for Williams says "**ARMED WITH** Handgun," but so does the report for Petitioner. *Compare* Williams Arrest Report, Am. Pet., Ex. H, at SA0233 (Dckt. No. 66-1, at 312 of 398) ("**ARMED WITH** Handgun") (emphasis and all caps in original) *with* Thompson Arrest Report, Am. Pet., Ex. G, at SA0227 (Dckt. No. 66-1, at 306 of 398) ("**ARMED WITH** Handgun") (same).

If anything, the description in the Petitioner's arrest report is more detailed than the description in Williams's arrest report. Both arrest reports included the same inventory number. *Compare* Williams Arrest Report, Am. Pet., Ex. H, at SA0235 (Dckt. No. 66-1, at 314 of 398) ("Weapon recovered and inventoried under inventory #12601708.") *with* Thompson Arrest Report, Am. Pet., Ex. G, at SA0229 (Dckt. No. 66-1, at 308 of 398) (same). But Petitioner's arrest report described the weapon, and included the serial number: "Weapon recovered was a Smith and Wesson, .357 Magnum, Serial number N595636, .357 Caliber, 4" barrel, Chorme [sic] finish." *See* Thompson Arrest Report, Am. Pet., Ex. G, at SA0229 (Dckt. No. 66-1, at 308 of 398).

Maybe reading the two arrest reports together would create ambiguity about who possessed the gun (if not both of them). *See* Am. Pet., at ¶ 70 (arguing that "the arrest report indicates that there was at the very least some uncertainty among the arresting officers about who

possessed the gun"). But a reasonable juror could have and would have credited the notion that Petitioner possessed the Smith and Wesson firearm, even if the Williams arrest report refers to a weapon, too.

Again, two police officers testified that they witnessed Petitioner possessing a gun. One officer saw Petitioner hold the gun while walking, and the other officer saw Petitioner with a gun in his lap in the car. *See* 6/26/15 Order, *People of the State of Illinois v. Thompson*, at ¶¶ 5–6 (Dckt. No. 10-1); *see also* Trial Tr., Am. Pet., at SA0007, L-29:20-22 (Dckt. No. 66-1, at 86 of 398) ("I could see in his right hand he had a large chrome handgun . . . ."); *id.* at SA0008, L-30:14-15 (Dckt. No. 66-1, at 87 of 398) ("I could see in his right hand a large chrome shinny [sic] handgun."); *id.* at SA0012, L-34:5-14 (Dckt. No. 66-1, at 91 of 398) ("And then Officer Rojas showed me a large chrome-colored or chrome revolver, a handgun . . . . That was the same handgun that I saw the defendant holding in his right hand . . . ."); *id.* at SA0038, L-73:10-14 (Dckt. No. 66-1, at 117 of 398) ("I actually observed a chrome handgun in his lap. Then [he] saw me, put the handgun, moved it right to the side of [the] passenger's door, between the door and the seat, and then put his hands out."); *id.* at SA0039, at L-74:11-13 (Dckt. No. 66-1, at 118 of 398) ("Mr. Thompson actually grabbed the handgun and placed it on the side towards the door and the passenger side seat.").

The incident report also reflect the fact that Petitioner possessed a gun. "OBSERVED OFFENDER THOMPSON, TARRENCE SIDE STEPPING EAST BOUND, FACING NORTH WHILE HOLDING A LARGE CHROME REVOLVER[.]" *See* Incident Report, Am. Pet., Ex. K, at SA0254 (Dckt. No. 66-1, at 333 of 398) (all caps in original).

At best, the Williams arrest report establishes that the police recovered a handgun in connection with his arrest. Petitioner's arrest report says the same thing. The ambiguous-at-best

arrest reports would not compel a reasonable juror to conclude that Williams possessed a gun but Petitioner did not. The reference to a firearm in both police reports would not lead a reasonable jury to conclude that Petitioner was unarmed.

The final piece of evidence is the testimony of Thomas Woods, an alleged eyewitness. *See* Woods Affidavit, Am. Pet., Ex. F, at SA0224 (Dckt. No. 66-1, at 303 of 398). Woods, also known as "Lord," was "working security for a drug operation on the west side of Chicago" on the day of the alleged robbery. *Id.* at ¶ 3. The victim, Willie Hughes ("C-Dog"), did the "hand-to-hand drug transactions," and Woods made sure that "C-Dog was not robbed of any drugs or proceeds by anyone during his shift." *Id.* at ¶¶ 3–4.

Woods saw the Petitioner ("Capone") enter the apartment building and approach Hughes. *Id.* at ¶ 5. Hughes "freely" handed Petitioner a large paper bag, and Petitioner then left. *Id.* at ¶¶ 5, 7. Woods did not see a gun or any aggressive behavior. *Id.* at ¶ 6. Hughes "appeared nervous," but "didn't mention anything being wrong," and then went outside. *Id.* at ¶ 7. Woods is "positive" that Petitioner was only carrying the paper bag. *Id.* at ¶ 8.

Unlike the other three arguments about ineffective assistance of counsel, the argument about the Woods affidavit did appear in the timely habeas petition. *See* Pet., at A-17 to A-21 (Dckt. No. 1, at 32–36 of 91). Petitioner faulted his counsel for failing to attempt to identify witnesses on the scene ("Tall," "Lord," and "Boise"). *Id.* at A-17. He also attached a copy of the Woods affidavit, which stated that Woods "did not observe Thompson carrying a gun." *Id.* at A-18.

So the argument about the Woods affidavit – unlike the other three arguments about ineffective assistance of counsel – is not time barred. Petitioner raised it in a timely manner in his original petition. The amended petition seeks to raise an argument that he already raised.

*See* Am. Pet., at ¶ 77 (Dckt. No. 66-1, at 44 of 398) ("Mr. Thompson's amended claim for ineffective assistance of counsel includes the existing ground from his original *pro se* petition (trial counsel's failure to investigate occurrence witnesses, including Thomas Woods, which was itself sufficient to entitle Mr. Thompson to an evidentiary hearing) . . . ."); *id.* at ¶ 83 ("[T]rial counsel's failure to investigate exculpatory witnesses, including Thomas Woods, was unreasonable and unwarranted."). There is no apparent need to amend the petition to add the argument about the Woods affidavit because it is already part of the ineffective assistance of counsel claim.

But the argument about Woods *is* new in one respect. The amended petition includes the Woods affidavit in the ineffective assistance of counsel claim (claim 2) *and* in the gateway actual innocence claim (claim 1). *Id.* at ¶¶ 59, 72–73. So Petitioner presses the Woods affidavit into double-duty. It is a basis for the ineffectiveness of counsel claim, and the actual innocence claim.

As Judge Aspen previously ordered, Magistrate Judge Weisman will preside over an evidentiary hearing on the ineffectiveness of counsel claim. That hearing will explore whether Petitioner suffered any prejudice from his counsel's failure to investigate possible witnesses and present testimony from Woods (and others). To some degree, that inquiry overlaps with the actual innocence inquiry – that is, whether it is more likely than not that no reasonable juror would have convicted Petitioner after hearing the new evidence. The standard is different, but both inquiries evaluate how much punch the Woods testimony would have packed (if any).

To avoid stepping on toes, this Court will defer a decision on whether the Woods affidavit would satisfy the standards for a gateway actual innocence claim. The Court can take

up that issue after Magistrate Judge Weisman hears the evidence, gathers the facts, and evaluates the credibility of Woods.

But the other three pieces of evidence do not get Petitioner through the actual innocence gateway. Overall, the new evidence does not add very much heft to Petitioner's defense. Even assuming the truth of the well-pleaded allegations, Petitioner has not stated an actual innocence claim. Even if (1) there were no fingerprints on the gun; (2) phone records showed that Petitioner spoke on the phone with Hughes; and (3) the police were impeached with the Williams police report, Petitioner would not be entitled to habeas relief.

Maybe the new evidence would have added bricks to a wall. But it does not seem like a very large or formidable wall.

The Court also views the new evidence in light of the record as a whole from trial. As the state appellate court found, "the evidence in this case was not closely balanced." *See* 6/26/15 Order, *People of the State of Illinois v. Thompson*, at ¶ 23 (Dckt. No. 10-1). Two police officers testified that they witnessed Petitioner with a firearm. *Id.* Hughes then arrived at the scene and accused Petitioner of stealing $260. *Id.* The police then found $260 in his pocket. *Id.* "In contrast to the officers' credible testimony, Hughes' trial testimony was incredible and contradicted portions of defendant's testimony, which also lacked credibility." *Id.* at ¶ 24. The state court found "overwhelming evidence of defendant's guilt." *Id.*

In light of the evidence as a whole, old and new, Petitioner has not shown that it is "more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt." *House*, 547 U.S. at 538. A reasonable jury would have convicted Petitioner after hearing the new evidence. *See Gladney*, 799 F.3d at 900. And "[w]ithout a strong showing of actual innocence required by *Schlup*," Petitioner's claims remain barred by the statute of limitations.

24

*Id.* He "cannot use the actual innocence gateway to overcome the statute of limitations in this case." *Lund v. United States*, 913 F.3d 665, 670 (7th Cir. 2019).

## II. Discovery

Petitioner's request for discovery is hereby denied. "As a general rule, federal habeas petitions must be decided on state court records." *Tabb v. Christianson*, 855 F.3d 757, 763 (7th Cir. 2017). "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997).

Rule 6(a) of the Rules Governing § 2254 Cases provides that a district court may allow discovery for "good cause." "Good cause" exists when "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . ." *Bracy*, 520 U.S. at 908–09 (quoting *Harris v. Nelson*, 394 U.S. 286, 300 (1969)); *see also Tabb v. Christianson*, 855 F.3d 757, 763 (7th Cir. 2017) ("To obtain discovery, the federal petitioner must '(1) make a colorable claim showing that the underlying facts, if proven, constitute a constitutional violation; and (2) show 'good cause' for the discovery.") (citation omitted).

"Where specific allegations convince the court that a *habeas* petitioner will be entitled to relief if the facts are fully developed, the court has a duty to provide 'the necessary facilities and procedures for an adequate inquiry.'" *Dyer v. United States*, 2020 WL 1276555, at *7 (E.D. Wis. 2020) (quoting *Bracy*, 520 U.S. at 908–09). But the factual allegations "must not be speculative or conclusory because discovery is not intended to be a fishing expedition." *Higgason v. Lemmon*, 6 F. App'x. 433, 436 (7th Cir. 2001).

Petitioner has not shown good cause for discovery. The claims are time barred, so discovery in support of untimely claims would not move the ball forward.

The actual innocence claim is not time barred. But it is a gateway actual innocence claim. And for the reasons stated above, it does not provide a path for the untimely claims.

Petitioner does not seek discovery to support a stand-alone actual innocence claim, meaning a claim in which innocence itself is the grounds for habeas relief. The Seventh Circuit has recognized no such claim. A claim of innocence, without more, is not enough. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993); *see also Arnold*, 901 F.3d at 837 ("To date, an assertion of actual innocence based on evidence post-dating a conviction has not been held to present a viable claim of constitutional error.") (citation omitted); *Tabb*, 855 F.3d at 763; *Moore v. Dempsey*, 261 U.S. 86, 87–88 (1923) (Holmes, J.) ("[W]hat we have to deal with [on habeas review] is not the petitioners' innocence or guilt but solely the question whether their constitutional rights have been preserved.").

### Conclusion

For the reasons stated above, Petitioner's motion is hereby denied.

Date:   January 8, 2021

Steven C. Seeger
United States District Judge

26